## Guth's Appeal.

The orphans' court has power, in the distribution of a decedent's estate, to allow a claim for damages arising from decedent's breach of covenants in a contract between himself and claimant.

The pendency of an action at common law for the claim does not oust the jurisdiction of the orphans' court.

In a lease of a mine wherein the compensation for the right to operate it is a certain per cent of all ore taken out, and the agreement contains no express covenant as to how the mines shall be worked, nor as to the amount of ore to be taken, the intention of the parties will be taken as being that the mine should be worked with reasonable diligence.

A claim by lessor against the lessee's estate for breach of such contract because of the failure to work the mine in accordance with the covenants of the lease will not be allowed, if it appears that lessees used reasonable diligence in the operation of the mine.

(Decided March 1, 1886.)

Appeal from a decree of the Orphans' Court of Lehigh County disallowing a claim against a decedent's estate. Affirmed.

To the auditor appointed to audit, settle, and distribute the estate of John Koch, deceased, a claim was presented by the heirs to Daniel A. Guth, for royalty for iron ore on a certain lease containing covenants running with the land, wherein the testator was possessed of one half of the undivided interest with Stephen Balliet, deceased. This claim was based upon the allegation that these mines were not worked since the 1st day of April, 1872, in accordance with the covenants contained in the lease, and for damages arising from the breach of the said covenant.

On August 23, 1842, Daniel A. Guth made an agreement in

NOTE.—The fact that proceedings have been instituted in the court of common pleas to establish a claim against a decedent will not prevent the presentation of his claim in the orphans' court. It will be ordered that a sufficient portion of the fund be retained to await the determination of the suit.    Hammett's Appeal, 83 Pa. 392; Bennett's Estate, 132 Pa. 201, 19 Atl. 58; Kern's Estate, 4 Pa. Dist. R. 73, Reversed on other grounds in 171 Pa. 55, 33 Atl. 129; Schenck's Estate, 4 W. N. C. 511.    But an adverse determination in the common pleas is binding on the orphans' court. Dyer's Appeal, 3 Grant. Cas. 326.    And distribution will not be delayed where the claimant has been guilty of laches in prosecuting his claim in the common pleas.    Gallagher's Estate, 19 Phila. 45.

writing under seal with Christian Pretz and others in which he agreed with them, their heirs, administrators, and assigns, to furnish and allow them the exclusive right and privilege to dig, mine and take away all iron ore and all other minerals which are or may be found in or upon the land described in the agreement. In consideration whereof, the parties of the second part covenanted and agreed "to deliver to the said party of the first part, or to his heirs or assigns, the one-sixth part of all the iron ore and of all other ores and minerals which they . . . may mine or dig or cause to be mined or dug, in or upon said land."

The grantees in said articles of agreement respectively assigned and transferred their interest in it to John Koch, Sr., and Stephen Balliet.

On March 20, 1852, Stephen Balliet and John Koch, the transferees of the lease, entered into an agreement with the Lehigh Crane Iron Company by which they granted to that company, for the term of twenty years, from April 1, 1852, the exclusive right to all the iron ore contained in the tract of land covered by said lease, in connection with the ore in another adjacent tract of land which had been leased from Jonathan Guth, and to which tract Koch and Balliet afterwards acquired title.

The Lehigh Crane Iron Company took possession of these two tracts of land, and continued to operate the mines until the 1st day of April, 1872, when their lease expired.

Before the expiration of the agreement with the Lehigh Crane Iron Company, John Koch, the testator, and Dr. L. B. Balliet, acting as the agent for the heirs of Stephen Balliet, who had died, made diligent efforts to extend their agreement with the Lehigh Crane Iron Company so far as the same applied to the tract of land owned by the Guth heirs. The Crane Iron Company refused to take an extension on the Guth tract alone, without the Koch and Balliet tract. During the same time Koch and Balliet also made diligent efforts to sell their farm in connection with the lease on the land of the Guth heirs.

On April 11, 1873, John Koch, the testator, and L. B. Balliet, attorney for the heirs of Stephen Balliet, deceased, entered into an agreement to lease the land to the Bethlehem Iron Company which subsequently surrendered its lease.

These ore mines were then leased to Benjamin H. Weaver, who commenced working them in 1874. Since then both the Guth tract and the Koch and Balliet tract have been worked

properly and satisfactorily, taking into consideration the de-mand for ore, the condition of the iron trade, and the facilities for mining on the place.

The following is the opinion of the auditor:

The only matter of contest before the auditor arose out of the claim presented by the Guth heirs. Two questions are involved in the consideration of this claim: First, Has the auditor jurisdiction of this matter? Second, If so, should the claim be allowed, and how much?

The claim is one of unliquidated damages, growing out of the alleged breach of contract. In the case of Fuller's Appeal, 98 Pa. 534, the supreme court held, reversing the court below, that "the orphans' court exceeded its jurisdiction in attempting to try and dispose of a question involving, at most, only the breach of a contract;" and that the proper remedy was an action at law brought by the representatives of Beatly's estate for the recovery of the damages resulting from a breach of the contract.

But by a careful examination of that case, it will be seen that the real question raised in it was only as to an agreement by Fuller to pay the money due on his contract in a particular manner; that is to say, by the payment of the mortgage which Beatly executed in order to raise the money paid to Fuller. It rules, therefore, only, what has often been decided, that the orphans' court is not the proper forum to try questions arising upon contract when they are not connected with the distribution of estates.

In Bull's Appeal, 24 Pa. 288, the court says: "In Kittera's Estate, 17 Pa. 422, it was shown that, after a contest between the legislature and the judiciary, the former had at last succeeded in establishing the jurisdiction of the orphans' court to appoint one or more auditors to make distribution of estates in the hands of executors or administrators, to and among the persons entitled to the same. These general terms embrace creditors, as well as heirs, next of kin and legatees. The right of each to be heard in support of his claim, and in opposition to every claimant who interferes with it, is necessarily involved in the right to demand payment out of the fund. The power to decide all questions necessary to a proper distribution of the fund follows the power of distribution, and vests in the orphans' court as a necessary incident to the jurisdiction."

In Whiteside v. Whiteside, 20 Pa. 474, Chief Justice BLACK

says: "If there be anything besides death which is not to be doubted, it is that the orphans' court alone has authority to ascertain the amount of a decedent's property and order its distribution among those entitled to it." See also Dundas's Appeal, 73 Pa. 479, and cases there cited.

The orphans' court has power, in the distribution of a decedent's estate, to allow a claim for damages suffered by reason of the deceit practised upon the claimant by the decedent. Machette's Estate, 8 W. N. C. 201.

And the pendency of an action at common law for the claim does not oust the jurisdiction of the orphans' court. The claimant must present his claim in the orphans' court, or be debarred from the fund. Hammett's Appeal, 3 W. N. C. 416; Schenck's Estate, 4 W. N. C. 511.

The auditor, therefore, has jurisdiction and must pass upon the claim. Are the claimants entitled to recovery; and if so, how much? is the next question. The provisions of the contract between the parties and all the facts essential to the determination of this question are contained in the auditor's findings, and will not be repeated at length here.

The first contract made in 1842, between Daniel A. Guth and C. Pretz and others, to the respective rights of which the present contestants have succeeded, was made at a time when mining in this community was in its infancy, and when the machinery and appliances for such operations were much more simple and inferior to those in use in 1872 and thereafter. What the demand for iron ore was at that time does not appear.

It is to be presumed that the mining carried on before 1852 by C. Pretz and others, under the name of the Guth Mining Company, and by the Lehigh Crane Iron Company from 1852 to 1872, was satisfactory to the owners of the Guth tract, because no damages are claimed on account of any default before 1872. Whatever default, if any, has occurred since that time.

Happily we have the aid of the opinion of the supreme court as to the light in which this contract must be viewed and its terms interpreted.

In Koch's Appeal, 93 Pa. 441, that court says: "While the rights granted are without limit as to time, and the agreement contains no express covenant as to how the mines shall be worked, or that any specified amount of ore shall be taken out, it does not follow that the appellants were at liberty to operate

the mines or not, as they saw fit. It was evidently the intention of the parties that they should be worked with reasonable diligence, and that would depend largely on the circumstances. The quantity and quality of the ore, and the demand that existed from time to time, would necessarily enter more or less into the question of due diligence. If the ore proved to be abundant and of good quality, and the demand was such as to justify the vigorous prosecution of the work, the spirit of the agreement manifestly required that it should be so worked."

Reasonable diligence, according to the circumstances, then, is the measure of assiduity with which his mine was and is to be operated.

The lessees of the mine had a right, under the agreement, to cause their parts of its duties to be done by others. Several years before the expiration of their agreement with the Lehigh Crane Iron Company, the lessees made diligent efforts to sell their farm and the Guth lease to the Lehigh Crane Iron Company, the Allentown Iron Company, and to other parties, who were amply provided with capital and other facilities to operate the mine to its full capacity.

When they did not succeed in selling, they made efforts to lease the Guth mine alone to the Lehigh Crane Iron Company from 1872 on, but Mr. John Thomas, the president of the company, refused to take it disconnected from the Koch & Balliet tract. Finally, after much effort, they entered into an agreement with the Bethlehem Iron Company, by which the latter agreed to operate the mines on both the Guth and Koch & Balliet tracts. This agreement was dated April 11, 1873, and was to continue in force for twenty years. Prior to that on March 3, 1873, the Guth heirs had filed their bill in equity against Koch & Balliet's executors and legatees, praying for a decree that the owners of the lease be compelled, either to operate the mine, or, in default of their compliance, to surrender, yield up, and cancel the lease. And when, shortly after the date of their agreement the Bethlehem Iron Company sent Samuel Adams, their agent, to the mines for the purpose of locating the place for the erection of their machinery, in order to carry out their agreement and operate the mine, Ephraim Guth, one of the claimants, told him that they did not acknowledge that Koch & Balliet had a lease; and that, whether they gained or lost under the equity proceedings. Mr. Adams reported this

fact to Alfred Hunt, the president of the Bethlehem Iron Company, and advised him to surrender their agreement, which was done.

Mr. Hunt testifies that they did not take possession of this property and mine it, for the reason that they understood that doing so would probably involve a lawsuit.

Upon the cancelation of the agreement with the Bethlehem Iron Company, the owners of the lease made an arrangement with Benjamin H. Weaver, who commenced the operation of the mine in the fall of 1874, and has continued to operate the same to this time. At first the Guth heirs did not remove their one sixth of the ore from the mouth of the pit, where he placed it for them.

From 1873 to 1879 the iron business was in a very depressed condition, and there was very little demand for iron ore. In relation to the continuous operations of the mine at its full capacity after 1874, Mr. Weaver testifies that "it was not in the extraordinary expense of mining; the difficulty arose from want of ready sales of ore, or whether the ore mined could be at a profit at the market price."

During the twenty years from 1852 to 1872, large quantities of ore were taken from the Guth tract, while but a small quantity was taken from the Koch & Balliet tract. During the same period very large quantities of dirt, rubbish, and mud from the Guth tract were deposited on the Koch & Balliet tract, so that Mr. Weaver, who is now operating the two mines, is compelled to remove, in some places, 60 feet of the dirt, rubbish, and hardened mud formerly deposited there.

In view of all these circumstances, and remembering the familiar maxims, that equality is equity, and that he that demands equity must do equity, the auditor cannot say that these lessees have been negligent in the performance of their part of the agreement. On the contrary, they have been operating the mine with reasonable diligence under the circumstances. The claim is, therefore, disallowed, and the amount of it is not necessary to be considered.

From a decree in conformity with this opinion the claimants appealed.

*A. J. Erdman, Butz & Schwartz,* and *A. B. Longaker,* for appellants.—The lessee must work a mine under the lease that he holds. Watson v. O'Hern, 6 Watts, 362.

In Brainerd v. Arnold, 27 Conn. 617, it was held that the lessees were not at liberty to work the quarry or not as they pleased, but were bound to improve it in a reasonable manner during the term of the lease. The written agreement is a sale of all the iron ore, rather than a lease of the land, with a continuing consideration, arising daily to pay one sixth of all the ore mined, and to be delivered at the mouth of the pit in good merchantable condition.

Johnston v. Cowan, 59 Pa. 275, rules that it is a sale, and not a lease. In that case the writing was construed to be an agreement to pay for the privilege of taking clay, and not a lease to dig it. The undertaking arises upon an implied covenant, to work continuously, with reasonable diligence, until the ore shall be exhausted, or until a surrender of the premises shall be made.

Justice Sterrett, in Koch's Appeal, 93 Pa. 441, says: It may be, according to the spirit and letter of the contract there is an implied warranty to work. They were not at liberty to operate the mines or not as they saw fit. It was evidently the intention of the parties that the mines should be worked with reasonable diligence, depending largely upon the circumstances.

M'Intyre v. Belcher, 4 C. B. N. S. 654, rules that, where a physician purchases a practice and agrees to pay one fourth of the yearly receipts to his vendor, his failure to practise will render him liable to damages. See also Watson v. O'Hern, 6 Watts, 365; Brainerd v. Arnold, 27 Conn. 617; Sharp v. Wright, 28 Beav. 150; Powell v. Burroughs, 54 Pa. 329; Walker v. Tucker, 70 Ill. 527; Morrison's Mining Dig. p. 196, pl. 116.

McDowell v. Hendrix, 67 Ind. 513, rules that, while the defendant retains possession, a failure to obtain coal sufficient to pay the minimum rent will not be a defense to an action for rent.

In Mellers v. Devonshire, 16 Beav. 252, 22 L. J. Ch. N. S. 310, it is ruled that inevitable causes occurring to prevent working will not relieve from the payment of rent. Nor will want of profits, and where the coal produced is not worth the expense of working. See also Ridgway v. Sneyd, 1 Kay, 627.

Nor will a ruinous expense of working, resulting from accidents, or defects in a mine nearly exhausted. Phillips v. Jones, 9 Sim. 519.

Nor will "unworkability to profit" afford ground to reduce or throw up a lease. Gowan v. Christie, L. R. 2 H. L. Sc. App. Cas. 284, also cited in Morrison's Mining Digest, .197, pl. 123.

Nor will insufficient quantity or the quality of salt water, rendering it unprofitable to operate the salt works. Clark v. Babcock, 23 Mich. 164.

Nor where an area of the least value remains to produce ore. Murdock v. Fullerton, 7 Shaw & D. Sess. Cas. 404. See also Jervis v. Tompkinson, 1 Hurlst. & N. 195, 26 L. J. Exch. N. S. 41; Jones v. Reynolds, 7 Car. & P. 335; Schuylkill & D. Improv. & R. Co. v. Schmoele, 57 Pa. 271; Harlan v. Lehigh Coal & Nav. Co. 35 Pa. 287; Bute v. Thompson, 13 Mees. & W. 487; McDowell v. Hendrix, 67 Ind. 513; Gilmore v. Ontario Iron Co. 86 N. Y. 455; Scioto Fire Brick Co. v. Pond, 38 Ohio St. 65.

Unforeseen hardships or inability to work with profit will not suspend rent, as where premises become uninhabitable. Surplice v. Farnsworth, 7 Mann. & G. 576; Murray v. Mace, Ir. Rep. 8 C. L. 396; Izon v. Gorton, 5 Bing. N. C. 501; Gregg v. Coates, 23 Beav. 33; Kline v. Jacobs, 68 Pa. 57; Magaw v. Lambert, 3 Pa. St. 444; Bussman v. Ganster, 72 Pa. 285.

*C. J. Erdman,* for appellees.—When a party enters into an agreement which can only take effect by the continuance of a certain existing state of circumstances there is an implied engagement on his part that he will not, of his own motion, do anything to put an end to that state of circumstances, under which alone the agreement can be operative. 1 Chitty, Contr. ed. 1874, 89; 2 Parsons, Contr. 676; Broom, Legal Maxims, 214; Stirling v. Maitland, 5 Best & S. 840; Robson v. Drummond, 2 Barn. & Ad. 303.

Where a party to a contract, by his acts or default, renders the performance of the contract impossible, or, if not wholly impossible, yet imposes such conditions upon its execution as to render its performance practically impossible, the other party to the contract may treat the same as rescinded. Seipel v. International Life Ins. & T. Co. 84 Pa. 47.

Per Curiam:

The facts found, and the conclusions of law stated by the

auditor in a clear and able report, are all confirmed and approved by the court. They fully justify the decree.

Decree affirmed, and appeal dismissed at the costs of the appellant.    -